State v. Wilson

---

STATE OF NORTH CAROLINA v. BOBBY RAY WILSON

No. 7218SC636

(Filed 25 October 1972)

1. **Criminal Law §§ 162, 169— unresponsive answer — no motion to strike — similar testimony subsequently given without objection**

   Admission of a witness's answer which allegedly was not responsive to the question put to him did not constitute prejudicial error where defendant objected but failed to make a motion to strike the answer and where the witness gave the same testimony on cross-examination without objection or motion to strike.

2. **Homicide § 28— instruction on self-defense — explanation of "without fault" and "free from blame"**

   In a prosecution for second degree murder or manslaughter, the trial court erred in not granting defendant's written request for clarification of the charge in order to relate the phrases "without fault" and "free from blame" to defendant's conduct at the time of the homicide and to dispel any idea that defendant's improper or unlawful conduct prior to the homicide, standing alone, would preclude his right of self-defense.

APPEAL by defendant from *Seay, Judge,* 31 January 1972 Session of Superior Court, GUILFORD County.

Defendant was indicted for the murder of Ray Douglas Bunton. The State elected to try defendant for murder in the

second degree or manslaughter. Defendant entered a plea of not guilty, was found by the jury guilty of voluntary manslaughter, and appeals from the judgment entered on the verdict.

Defendant offered no evidence and did not testify in his own behalf. The evidence offered at the trial tends to show, in summary, the following: Earl Joseph Reardon (Reardon), who was 19 years of age at the time of the killing, and Ray Bunton, the deceased, who was 13 years of age, left the home of the deceased about noon on Sunday, 22 August 1971. They, with a brother of deceased, went to Greensboro where they visited at the hospital, visited some boys at their place behind a filling station and went to a drive-in beer joint. Reardon drank some beer. Deceased did not. They left the beer joint after dark and decided to go to the General Greene and arrived there about eleven o'clock. They "had heard that homosexuals hung out at the General Greene" and that "if you let them have a homosexual act with you they would give you money." All three went into the General Greene but came back out. Deceased's brother met a friend in the parking lot and did not go back in with Reardon and deceased. Reardon had not previously been there. They sat at a booth and Reardon ordered a beer. Deceased did not drink a beer. They saw defendant and a companion sitting at a bar. Defendant was dressed in a wig and a woman's purple pants suit and carried a lady's pocketbook. Reardon knew defendant was a man and they motioned for defendant and his companion to come sit with them. Defendant said he had an apartment at the O'Henry Hotel across the street, that they "would get some beer, go there and have a party." The man with defendant was Raymond Bridges. The four of them went to defendant's room in the hotel. No conversation had been had with respect to homosexual activity. When they got into the room, defendant put the beer in an ice chest. Bridges and deceased got on the bed. Defendant went in the bathroom and Reardon followed him. They disrobed and Reardon allowed defendant to perform an homosexual act upon him. They remained in the bathroom about 30 minutes. When they came out deceased was sitting on the edge of the bed fully clothed. Bridges was seated in a chair. Reardon put his clothes on. Defendant remained undressed with only a towel around his waist. Reardon asked defendant for money. Defendant refused and replied that "we should give them money, and told us to get out of there." Reardon hit defendant in the face with the back of his hand. "I flew mad, I

guess, because he got smart with me. I hit him hard." A scuffle ensued with Reardon and defendant. Reardon's head hit the wall. Defendant got a knife from the bureau and cut Reardon on the head, shoulder and arm. Deceased got up from the bed and went toward defendant. At that time "I saw Wilson (defendant) make a motion toward Ray (deceased) with the knife." Both Reardon and deceased then left the room, Reardon a step or two ahead of deceased. A short distance down the hall deceased fell to the floor and Reardon realized he was badly injured and ran to the police station for help. The police officers arrived at the hotel at 2:45 and found the body of deceased lying in a pool of blood. Blood led to room 39 about 20 to 25 feet from the body. When the officers entered the room, defendant was seated in a chair dressed in a towel. He stood up when the officers entered. They saw no injuries, bruises, or lacerations on him. They warned him of his constitutional rights and he replied that he understood them. When the officer said that there must be a knife around, defendant said "You must mean this one" and reached into the top dresser drawer and withdrew a hunting knife. As he pulled it from the drawer he said "Let me show you how I did it." A statement was not taken from defendant at that time. There was blood on the floor, the bed and the walls. A stereo set had been turned over. "It looked like there had been a scuffle in the room."

The pathologist who performed the autopsy on the body of deceased testified that deceased had a superficial abrasion over the bridge of the nose and the right cheek. The main wound was in the right chest region. The wound extended from the chest wall back to the backbone lacerating the inferior vena cava. Death was caused by massive hemorrhage from the lacerated vein. "The sharp instrument went through the rib cage causing a complete transection or cutting across of the fifth rib on the right. The rib was cut in two pieces."

*Attorney General Morgan, by Associate Attorney Earnhardt, for the State.*

*Cahoon and Swisher, by Robert S. Cahoon, for defendant appellant.*

MORRIS, Judge.

Defendant assigns as error the failure of the court to allow his motion to dismiss as of nonsuit. The evidence was sufficient

for submission of defendant's guilt to the jury, and this assignment of error is overruled.

[1] Defendant brings forward only one exception to the evidence. To the solicitor's question: "What did he do with the knife?" the witness answered: "He cut me on my shoulder and head and this arm too. And about that time Ray got up from right here and went toward him, to help me out." Defendant objected in this form: "Object to what he was going to do. Just tell what happened." The court overruled the objection. On appeal defendant argues the answer was not responsive and was an impermissible statement by the witness as to deceased's intent and mental processes. The question was not objectionable. True the answer, in part, is not responsive. "It is well settled in this jurisdiction that defendant's objection should have been accompanied by a motion to strike the objectionable statement from the record if he deemed it incompetent and prejudicial." *State v. Gooding*, 196 N.C. 710, 711, 146 S.E. 806 (1929); *Highway Commission v. Black*, 239 N.C. 198, 79 S.E. 2d 778 (1954). There was no motion to strike any portion of the answer. Additionally, upon cross-examination, the witness gave the same testimony without objection or motion to strike. This assignment of error is without merit.

[2] Defendant also assigns as error the refusal of the court to give instructions tendered in writing by defendant and, in addition, contends that prejudicial error appears in certain portions of the charge as given.

Defendant contends that he was entitled to have the court instruct the jury that the fact that he had previously, even in the immediate past, been guilty of wrongful acts or of an unlawful homosexual act would not, standing alone, deprive him of his right of self-defense. We think defendant's position is well taken.

Ordinarily the words "without fault" and "free from blame" are words of such common usage that their use with respect to defendant's conduct in bringing on the controversy would not require definition or further explanation. Instructions to the jury using these words, or similar words of identical import, have frequently been approved in this jurisdiction. See *State v. Jennings*, 276 N.C. 157, 171 S.E. 2d 447 (1970).

State v. Wilson

In *State v. Jennings, supra,* at pp. 162-163, Justice Branch, writing for the majority of the Court, said:

"Likewise, it is our opinion that conduct towards another must be evaluated within the framework of the surroundings, circumstances and parties, including their previous relations and the then existing state of their feelings. However, the fact that a person has previously been guilty of immoral conduct or wrongful acts, or has had past difficulties with the decedent, does not, standing alone, deprive a defendant of his right of self-defense. 40 C.J.S., Homicide, § 119, at 990. The requirement that a defendant must be free from fault in bringing on the difficulty before he can have the benefit of the doctrine of self-defense ordinarily means that he himself must not have precipitated the fight by assaulting the decedent or by inciting in him the reaction which caused the homicide. Usually, whether the defendant is free from blame or fault will be determined by his conduct at the time and place of the killing. Yet the fault in bringing on a difficulty which will deprive him of the right of self-defense is not confined to the *precise* time of the fatal encounter, but may include fault so closely connected with the difficulty in time and circumstances as to be fairly regarded as operating to bring it on. 40 Am. Jur. 2d, Homicide, § 145, at 434."

In that case, defendant had been engaged for a period of years in conduct with deceased's wife which, in the eyes of an average juror, would fix him with blame and fault. There the court held that under the particular facts of that case, the court should have amplified and explained the meaning of "without fault" and "free from blame" when defendant specifically requested such charge. In so doing, the Court said, "We wish to make it crystal-clear that we do not intend to overrule the line of cases which have used the words 'without fault' or 'free from blame' without further definition when there was no request for further instruction. We emphasize that this opinion must be read in connection with the facts of the case." *Jennings,* p. 163.

We think the facts in the case before us require the application of the rule of *Jennings.* We, therefore, conclude that the court, upon request of counsel, should have further clarified the charge in order to relate the phrases "without fault" and

"free from blame" to defendant's conduct *at the time of the homicide* and to dispel any idea that defendant's improper or unlawful conduct prior to the homicide, standing alone, would preclude his right of self-defense.

Defendant, therefore, must be given a

New trial.

Judges BROCK and HEDRICK concur.